GEORGIA, CAROLINA & NORTHERN RWY. CO. *v.* HALLMAN.

*Lumpkin, J.*—There being clear and uncontradicted evidence that the plaintiff's husband, an employee of the railway company, was himself guilty of negligence in bringing about, and contributing to, the casualty by which his death was occasioned, she was not entitled to recover, and the court erred in denying a new trial.          *Judgment reversed.*

August 16, 1895.

Action for damages.  Before Judge Hutchins.  Gwinnett superior court.  September term, 1894.

The widow of Hallman sued the railroad company for his homicide, and obtained a verdict.  The company moved on the general grounds for a new trial, and the motion was

denied. It appears, that Hallman was the conductor of a construction train consisting of an engine, eighteen or twenty flat cars, and four shanty-cars at the other end, the latter being ordinary box-cars with windows, used for eating and sleeping by the laborers of the train. He had been so employed about ten days or two weeks, taking the place of one Harding, who had been suspended. At the time of the homicide Hallman was standing on top of the shanty-car nearest to the engine; and plaintiff claimed that he was there for the purpose of giving signals to the engineer, as the train was backing toward a station for the purpose of going upon a side-track to allow a freight-train to pass upon the main line. Hallman's train had gone southward about a mile past Gloster station (moving forward) when the bumper was pulled out of the second shanty-car, separating the train. It was stopped, and while the cause of the accident was being repaired, the freight-train coming northward was heard to blow, and the flagman of Hallman's train went forward to flag down the freight-train. Hallman's train was then nearer to Gloster than to the next station. As it was backing to go on the side-track at Gloster, the bumper and other coupling-apparatus which had just been replaced, fell and stuck into the ground and derailed a pair of the trucks of the car on which Hallman was standing, pitching him to the ground, and he was run over and killed. Plaintiff claimed that the company was negligent: in failing to provide a caboose with an observatory at the top of it, from which Hallman could give signals instead of standing on top of the car; in having and using defective bumpers or cars not in good condition; in that the company was notified, ten days previously, of the defective bumper, and warned that the car was dangerous and ought to be repaired, which was not done; and in that the company's car-inspector had assured Hallman, but a few hours previously, that his train was in good repair, that it would stand a run of twenty or twenty-five miles an hour, and that he could safely go ahead and use it.

Harding testified: I was acquainted with the car. Its condition was not good. I had reported it. It had no observatory on top, or elevated place. The signal could be seen better on top of this car. The condition of all of the shanties had been reported to the roadmaster and engineer of roadway department. Had not said anything to Hallman about the condition of the cars. Their condition could be seen by him.

The engineer of Hallman's train testified: Hallman was giving no signals to me. I was backing by his order. I could not see him at the time of the accident, on account of the length of the train and a curve in the track. There was no caboose in the train; they don't use caboose on that train. There was no elevated place on the shanties. Some cabooses have elevated places and some have not. The conductor generally rides on a caboose, and the shanty-cars on a work-train answer the same purpose. When a train is backing, the conductor is supposed to be in the rear of the train for the purpose of signalling. I am not supposed to see him all the time; just so the trainmen under him give the signals. I don't know that it was proper for him to be on top of the car; he could be in the car as well as on top. I could not see him any better on elevated place of a caboose, than I could inside the car. There is just a little elevation above the top of the car, and the engineer could see the upper part of his body. If there had been an observatory, that would have been his place. His place would have been in the rear end on the steps on the engineer's side, or he should have been inside leaning out of the car. Of course he could be seen better on top. On top he could see the way train was going and it was backing, and if on a curve he could see behind. He could not stand in any other place and be seen as well. Train was in a cut and on a curve when accident happened. When a train is backing, conductor is supposed to be in the cars or on the rear of the back platform. It is customary for him to be in the

cars. He gives his signals out of the door or windows. He can give them from platform by leaning out. With a long train or when in a cut, signals are carried forward to the engineer by the train-hands; there were plenty of hands on the train to carry forward the signals by passing from one to another. There were about thirty-five, regular crew and work-hands. These hands were stationed along the train so they could pass the signals to the engine. The car on which Hallman was standing had nothing on top of it but the board down the middle of it. These shanty-cars were those usually used in material trains. A caboose is generally used on freight-train. There is no trouble about giving signals from the side doors or windows or platforms of shanty-cars. I never saw Hallman on top of the car but on this occasion. He usually gave his signals from the rear end. If it was his duty to be on top of the car, I don't know it. I think he ought to be on the platform, and if not on the platform, he should have been inside the car. It was about five o'clock in the afternoon of November 7; about dusk; it was raining a little. Train was backing very slowly, about four or five miles an hour. I don't think the bumper was broken; it stuck in the ground and bent over. I examined the car; saw where the bumper pulled out from; saw the pin inside the car. The pin was in position. It should have been through the tail-rod, but it was not. The pin was in position, but the tail-rod through which it ought to have gone was not. If the pin had been through the end of the tail-rod at the end of the bumper, the bumper would not have pulled out. There is a hole through the tail-rod for the pin to go through, which holds the bumper in the car. The pin goes through the floor of the car into the tail-rod on the end of the bumper; and if the pin goes through the tail-rod, the bumper cannot fall out without breaking the pin. The pin was in the right place, and was not broken. There was a door on each side of the car on which Hallman was

standing, but no platform.    I have seen conductors on top
of shanty-cars.    Sometimes when they have business over
towards the engine, they may come out of the car and get
on top of it and walk over that way; that is very seldom;
they generally send a flagman; the flagman goes on top if
they send a signal.    I have at times seen conductors on top.
I examined the car next morning and found the pin in its
place.    I saw no sign of its having been in the tail-rod.
The tail-rod might possibly have been bent over.    I don't
think it was broken; I don't remember whether it was or
not.    It was bent in that direction.    It was broken, but
not broken clear off.    The pin was not broken.    The duty
of a conductor on a train backing is to be on the rear end of
the train on the platform, or in the car if there is no plat-
form.

Lane, chief car-inspector of defendant, testified: I had
inspected the cars in Hallman's train about three hours be-
fore he was killed, and told him they were perfectly safe
to run twenty or twenty-five miles an hour.    Twenty-five
is the maximum speed of a material-train.    The car in the
rear of the one he was killed on was constructed with four
timbers, with a long tail-rod going through between the
center-plate.    The remainder was constructed with draft-
timbers.    The draft-iron was fastened to the draft-timbers.
The bumper is fastened to the car with the tail-rod which is
fastened to the bumper and runs under the car.    In the end
of the tail-rod is a hole, and the pin goes through the floor
of the car and through the hole in the tail-rod which thus
holds the bumper in position.    I saw the car the next
morning.    There was a pin in the proper place.    It was
not broken, but was bent.    There was no defect in the pin.
It was 28 inches long.    If the tail-rod is pushed back to its
proper place and the pin put through, it is perfectly safe.
If the pin misses the hole in the rod and goes to one side or
the other, or to the end of the tail-rod, there is nothing to
v 97-21

hold the bumper, and a pull upon the bumper will pull out the whole. It can be seen from the position of the bumper, whether the pin is through the tail-rod. If the tail-rod is not pushed back far enough to let the pin through, it will be shown by the bumper sticking out four or five inches too far; that is the distance from the hole in the tail-rod to the end of it. If it is pushed back far enough, and the pin goes down on one side or the other, missing the hole, the bumper shows it on the outside by being twisted to one side or the other as the case may be. Any one that looks can see whether the pin has gone through the tail-road. I saw the pin that broke when the bumper first pulled out; it was a clean break; no flaw in it. It was rusty; had been raining that night and evening; if there had been a flaw, it would have been black. I examined the tail-rod next morning; it was bent in such a way as it would have been had it been stuck in the ground. It was not broken; only bent. The draw-head that is outside of the car, and the tail-rod, are made of iron. The tail-rod is fastened to the draw-head, and at the point of fastening is a spring; it goes through the spring and is fastened to the draw-head by a key. There was no trouble about that part of the bumper. The only thing the matter with the bumper was, the tail-rod was bent. The timbers of the car were perfectly sound. A person putting the pin in the tail-rod could tell, if he was in the car, that the pin had gone through the tail-rod, by looking through the hole in the floor of the car. I have seven years experience in running railroads, having been on three others (naming them) beside that of defendant. The cars used in this material-train were such as are usual in such trains on other roads. I never saw a caboose (a car with a cupola) in a material-train. In a shanty-car the conductor communicates his signals to the engineer by signalling out of the door or off the platform or through the windows, and his signals are continued by the train-hands or top brakeman if he is on a freight-train. When

the train is backing the conductor's duty is to be on the extreme rear of the train inside of the car or on top. There are no rules on the subject. The common usage has made it customary to remain inside. If the pin had been placed through the hole in the tail-rod, it would have been impossible for the tail-rod to have pulled out without breaking the tail-rod. Either the tail-rod or the pin had to break. When I got there next morning, the pin was down in the hole, somewhat bent, and the tail-rod was bent. As evidence that the tail-rod was not broken, the car was pulled from Gloster to Elberton with the same tail-rod and drawhead. The pin was slightly bent through the trucks striking it when the car lifted up. The pin used was the standard pin in use on all roads. The arrangements for fastening the tail-rod were considered safe at the time those cars were constructed. They have of late years been using draft-timbers. Some use rods yet; they have not abolished them. There is sufficient down-grade in approaching Gloster to take the slack out of a train when it stops. When a bumper is pulled out and is placed back, the proper way to see if it is fast is to have the engine make a slight pull on it, or take hold by the hand and make a hard pull on it. It was fifteen or sixteen hours after the accident before I saw the train. I did not see the pin broken, but I am morally sure it was. I know there was only one broken pin and one good pin on the car, and I know it was used. There was no rule requiring the conductor to take a position on top of the car, nor requiring him to be inside of the car. It was discretionary with him. It was not customary for him to signal from the top. He would have to use his brakeman to carry his signal, whether on top or inside. If his brakeman did not do it, he would have it to do. When I saw the wreck the pin was slightly bent; it was not out of a true straight. As the car elevated the trucks the pin must have struck against the end of the truck. Pins have been bent that way, and I supposed that was the way it was

done. The tail-rod was bent; it was not broken; if it was, I could not see it. I did not pick it up and examine it. The car was carried to Elberton with the same tail-rod and bumper. There have been improvements in bumpers, but the ones like that in question are still in use. The improved bumpers are not used in material-trains, etc. There was nothing wrong about the pin that could be discovered by an inspection. The pin frequently breaks when there is apparently no reason for it, and where there is less strain than there was on that one. It happens every day wherever trains are used.

Other testimony was, in brief, as follows: Hallman superintended putting back the bumper when it was first pulled out; it was done by his order. The cause of its pulling out was the breaking of the center pin; it was broken half in two. The flagman thereupon got the only whole pin on the tool-car (there were several broken ones in it), and the bumper was lifted and put back by several workmen. They had trouble in getting it back; the tail-rod did not go into the right place; it was caught between the timbers so that the pin would not go through the hole. Repeated attempts were made to shove it through, but it would not go. The flagman told Hallman the pin was not in the tail-rod, and he replied, "Well, I expect it is in there, because it don't seem to be very far out here." When the freight-train blew and the flagman started to flag it down, he told Hallman, as soon as the engineer coupled up, to let him slacken to see that the pin was not down through the tail-rod, again telling him it was not. The engineer did not pull on the bumper. As the flagman passed the engine, Hallman gave the signal to back. One of the workmen who helped to put the bumper back also told Hallman the pin was not in the tail-rod. He knew this from the way the bumper was standing; it was twisted round. The pin went down by the side of the bumper, but was not in the tail-rod. According to the testimony of one of the work-

men, Hallman paid no attention to what he and another workman said, but coupled up the train and started back. His train could have been protected so as to give time to properly fix the bumper, etc.

In rebuttal, there was testimony for plaintiff, as follows: It is not necessary for the engine to pull against the bumper to see if the center pin is in. Any one can tell by looking at it. It is customary for conductors of work and freight-trains to go on top or anywhere they can be seen from the rear end of the train. It is not unusual for a freight-train to part. The bumper can be in and still turn round on the tail-rod, etc.

*Erwin & Cobb* and *N. L. Hutchins, Jr.*, for plaintiff in error. *J. P. Shannon* and *C. H. Brand*, by *Harrison & Peeples*, contra.